UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| BARBARA WASHINGTON-NOLDEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 4:10-CV-1783 (CEJ) |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I. Procedural History

On January 23, 2009, plaintiff Barbara Washington-Nolden filed an application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, with an alleged onset date of April 10, 2008. (Tr. 99-103). After plaintiff's application was denied on initial consideration (Tr. 54-57), she requested a hearing from an Administrative Law Judge (ALJ) (Tr. 59-60).

The hearing was held on December 21, 2009. (Tr. 4-26). Plaintiff was represented by counsel. The ALJ issued a decision denying plaintiff's claims on July 21, 2009. (Tr. 31-51). The Appeals Council denied plaintiff's request for review on July 30, 2010. (Tr. 1-3). Accordingly, the ALJ's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

At the time of the hearing, plaintiff was 50 years old. (Tr. 33). She had been separated from her husband for several weeks and was living in a neighbor's house.

(Tr. 42).  Her educational background included an associate's degree in culinary arts and a nursing assistant certificate.  (Tr. 33-34).

Plaintiff previously worked as a nurse assistant, a counselor, a resource manager, and a prep cook.  (Tr. 34-35).  She stated that she left her employment in the catering department of a hotel in April 2008 due to "communication problems with the supervisor" and difficulty standing for long periods of time.  (Tr. 35).  She was receiving unemployment benefits at the time of the hearing and expected to receive benefits for two more weeks.  (Tr. 36).  She testified that she is not physically or emotionally capable of full-time work.  (Tr. 45).

Plaintiff has difficulty with walking or standing for prolonged periods and climbing stairs.  (Tr. 37).  She has problems with her lower back, her knees, and her hips and her ankles swell.  (Tr. 39).  She experiences shooting pains in her neck, shoulders, and arms when she reads or holds her head in one position.  Id.  She finds it hard to carry anything in her arms.  (Tr. 39).  Her blood pressure is not under control despite medication, and she has headaches every day.  (Tr. 37-38).  She has been diagnosed with fibromyalgia and congestive heart failure.[1]  (Tr. 38, 40).  She has swelling in her legs and tries to keep her legs elevated, but doing so causes pain in her waist, knees, and legs after 5 or 10 minutes.  (Tr. 40-41).

Plaintiff testified that her family members take care of her laundry.  (Tr. 42-43).  She does not have a washer and dryer and cannot bend over the tub to wash clothes by hand.  She cannot afford to take clothes to a laundry.  She uses an electric cart if

---

[1]Evidence in the record does not conclusively establish either of these diagnoses. See Tr. 493 (on July 29, 2009, cardiology department at Connect Care found no sign of congestive heart failure); Tr. 541 (on May 14, 2009, pain management specialist could not state plaintiff had fibromyalgia).

she goes to the grocery store.  (Tr. 43-44).  She does some cooking.  (Tr. 44).  Using a vacuum cleaner caused pain in her elbows and shoulders.  (Tr. 44).  She mostly tries to stay in one room so there is not much cleaning to do.  Id.

Plaintiff began to cry during the hearing.  (Tr. 44).  She does not see a psychiatrist because she does not want others to feel sorry for her or think she is crazy.  She takes an antidepressant but does not believe it helps with her symptoms. (Tr. 45).

John McGowan, Ed.D, a vocational expert, provided testimony regarding the employment opportunities for an individual of plaintiff's age, education, training and work experience; who is right-handed; who can lift and carry 20 pounds occasionally and 10 pounds frequently; can stand or walk for 6 hours out of 8; can sit for 6 hours out of 8; can occasionally climb stairs and ramps; never climb ropes, ladders, and scaffolds; can occasionally stoop, kneel, and crouch; requires less than constant use of foot controls on the left; and who must avoid concentrated exposure to extreme cold.  (Tr. 47-50).  Dr. McGowan opined that such an individual could return to plaintiff's past work.  The ALJ next asked the expert to assume that the individual could sit, stand, or walk for less than 2 hours; rarely lift less than 10 pounds; rarely twist, stoop, or climb ladders or stairs.[2]  Dr. McGowan opined that such restrictions would preclude employment.

The record contains a Disability Report completed by plaintiff.  (Tr. 144-63). She identified her disabling conditions as congestive heart failure, edema, degenerative arthritis, fibromyalgia, depression, high blood pressure, chronic back pain and

_____

[2]The limitations set forth in the ALJ's question reflect those found by plaintiff's treating physician, Zarmeena Ali, M.D., on May 15, 2009.  (Tr. 467-71).

-3-

weakness on the right side.  (Tr. 145).  Elsewhere, she wrote that she is short of breath and sensitive to cold and heat and has memory loss.  (Tr. 162).  Her conditions limited her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, use her hands, complete tasks, follow instructions, and concentrate.  Her memory was also affected.  (Tr. 136).  She noted that the pain interfered with her sleep.  Plaintiff's medications included the blood-pressure medications Clonidine, Maxzide, Norvasc, and Zestril; the pain medications Darvocet, Flexeril, Neurontin, Ultram, and Vicodin; the psychoactive drugs Hydroxyzine[3] and Prozac; and a cholesterol medication, Zocor.  (Tr. 151-52).  An updated report completed on November 21, 2009, listed plaintiff's blood-pressure medications as Clonidine, Cozaar, Hyzaar, Lasix, Hydrochlorothiazide, Lopressor, and Sular; her medications for pain and musculoskeletal conditions as Darvocet, Flexeril, Neurontin, Savella,[4] Skelaxin,[5] Sulindac,[6] and Tylenol #4; and her

---

[3]Hydroxyzine is used to treat anxiety and to treat the symptoms of alcohol withdrawal.  See www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 28, 2009).

[4]Savella is a selective serotonin and norepinephrine re-uptake inhibitor indicated for the management of fibromyalgia.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a609016.html  (last visited on Sept. 1, 2011).

[5]Skelaxin is indicated for the relief of discomfort associated with acute musculoskeletal conditions.  See Phys. Desk Ref. 1685 (60th ed. 2006).

[6]Sulindac is an NSAID used to relieve pain caused by osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis.  See http://www.nlm.nih.gov/medlineplus/drug info/meds/a681037.html (last visited on Sept. 1, 2011).

-4-

psychoactive medications as Prozac, Prochlorper,[7] and Zolpidem.[8]  In addition, she was prescribed Zocor and potassium chloride.  (Tr. 177-78).

Plaintiff completed a Function Report on February 18, 2009.  (Tr. 129-43).  At the time, she still lived with her husband.  In describing her daily activities, she stated that, between 5:30 and 6:00 a.m., she took a shower, cleaned her bedroom, washed dishes and swept the floors.  Thereafter, she cared for a grandchild.  She and her husband cooked complete meals every day.  She read, cooked one-pot meals, and baked a little.  In response to a question whether she took care of anyone, plaintiff wrote that she cared for her husband, a diabetic with a history of back surgery, and her eight grandchildren. She also maintained two fish tanks.  Her conditions impaired her sleep and made it difficult to dress herself.  She needed assistance to get out of the bathtub.  She was able to walk for 10 or 15 minutes before needing to rest for about 10 minutes.  She stated that she could not go up and down stairs very often and was unable to sweep every day.  She did laundry twice a week with her husband's assistance.  She did not lift any heavy objects and or do outdoor chores.  She got rides from others or took public transportation.  She rarely went out by herself because she got confused.  She could no longer engage in activities she enjoys, such as bowling, baseball, and traveling, and she found it too uncomfortable to sit in church.  She described herself as confused, angry, unable to concentrate, and afraid of what people think of her.  She stated that she had "demonic dreams."  She used crutches or a cane

---

[7]Prochlorperazine, also known as Compazine, is used to control severe nausea and vomiting and to treat the symptoms of schizophrenia and anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682116.html (last visited on Sept. 1, 2011).

[8]Zolpidem is a sedative-hypnotic used to treat insomnia.  http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693025.html (last visited on Sept. 1, 2011).

at times, and wheelchairs when available. She stated she was injured in a bicycle accident in 2005 and again when she fell on ice in 2008. She could pay attention for about 20 minutes. She could pay bills and count change, but could not manage a savings account or use a checkbook.

### III. Medical Evidence

The earliest entry in the medical record is the report of a radiology consultation at St. Louis ConnectCare on April 20, 2007, which indicated minimal joint degeneration of plaintiff's left knee and degenerative changes in her cervical spine. (Tr. 388-89). There was no evidence of fracture or dislocation.

Plaintiff was seen at ConnectCare on August 20, 2007, with complaints regarding pain in her left knee. She reported that she had been in a "hit and run accident" on December 4, 2006. (Tr. 385).

An MRI of plaintiff's left knee completed on September 21, 2007, disclosed focal patellar cartilage thinning with underlying subchondral cysts. (Tr. 427-28). Also noted were a small Baker's cyst[9] and a possible tear of the posterior horn of the medial meniscus.

Plaintiff went to ConnectCare's urgent care center on November 15, 2007, with complaints of pain in her right shoulder that went to her fingers. (Tr. 378). She reported that she had previously slammed a car door on her right hand and had sustained a whiplash injury in a car accident. She had been in pain for about 2 months. (Tr. 380). X-rays indicated minimal degenerative changes in the lower cervical spine and no fracture of the right thumb. (Tr. 383-84).

---

[9]A Baker's cyst is an abnormal extension of the synovial lining in the knee. The cause is believed to be an accumulation of fluid in the joint space. Robert K. Ausman and Dean E. Snyder 3 Medical Library; Lawyers Edition § 4.49 (1989).

On December 11, 2007, plaintiff sought treatment at Northwest Healthcare's emergency room for persistent pain in her left knee and her elbow. (Tr. 236-45). She reported that she had fallen a month earlier. She had not improved despite treatment with Ibuprofen, Darvocet, and Soma.[10] She reported that she had experienced mild swelling and pain in other joints as well. She described the pain as sharp and radiating. On examination, it was noted that plaintiff had normal ranges of motion in all four extremities, her elbow and her knee. She did not have edema or swelling or deformity of the joints. She had moderate tenderness at the right elbow and mild tenderness at the knees, shoulders and wrists.

Plaintiff was seen by W. David Kistler, M.D., on December 19, 2007. She complained of pain in her right shoulder. She was noted to have edema at the right ankle. (Tr. 252). Plaintiff was prescribed Soma, Vicodin, and a muscle relaxant. Id. The results of blood tests conducted that day were normal. (Tr. 253).[11]

Plaintiff was seen at Northwest Healthcare's emergency room on February 9, 2008. (Tr. 203-35). She reported that she had fallen on concrete steps and injured her left hip and side. She complained of pain in her back and in her left hip, buttock, and leg all the way to her toe. X-rays disclosed no fractures. On examination, plaintiff had normal ranges of motion in all extremities; her left hip was tender and red; her lumbar back was tender to palpation; straight-leg raising was negative. Plaintiff could

_____

[10]Soma is a brand name for Carisoprodol, a muscle relaxant. http://www.nlm. nih.gov/medlineplus/druginfo/meds/a682578.html (last visited on Sept. 1, 2011).

[11]There are brief (and nearly illegible) treatment notes from Dr. Kistler dated April 15, 2008, May 7, 2008, July 29, 2008, July 31, 2008, and September 15, 2008. (Tr. 251). The notes reflect that plaintiff received prescriptions for Avalide, Darvocet, Soma, Lotrel, and Lyrica. The notes do not include diagnoses or objective findings.

not be discharged until her blood pressure stabilized.    She was treated with Tramadol,[12] Vicodin, Clonidine, and Flexeril.

Plaintiff went to the SSM DePaul Health Center emergency room on March 5, 2008, reporting that she had fallen in the snow the day before.  (Tr. 294-96).  She complained of pain in her left toe and knee, which she described as stabbing and rated at 8 on a 10-point scale.  On examination, there was no deformity, swelling, hematoma, or warmth, and plaintiff had full range of motion.  There was tenderness to palpation.  X-rays indicated no fractures, dislocations, or joint disease.  Her blood pressure was high.  She was discharged with a prescription for Ultram and told to take Ibuprofen as needed.

On June 20, 2008, plaintiff sought treatment at St. Louis ConnectCare's urgent care center for pain in her low back and left knee.  (Tr. 361-68).  She stated that the pain had been at 10 on a 10-point scale for 3 days.  X-rays of the lumbar spine indicated "minimal degenerative changes" of the lumbar spine with a possible transitional vertebra, lumbarization of T12 or extremely short length of the twelfth ribs.  An x-ray of the left knee showed minimal degenerative joint disease.

Plaintiff was seen by Walter J. Griffin, M.D., at the John C. Murphy Health Center on July 11, 2008.  (Tr. 411-13).  Plaintiff reported that she had been injured two years earlier, first in a bicycling accident and then in a car accident.  She complained of constant pain in her knees and lower back.  She had undergone MRIs but did not know the results.  She also did not know what medications she had taken for her blood pressure.  Dr. Griffin described plaintiff as alert, anxious, cooperative and in acute

---

[12]Tramadol is prescribed for treatment of moderate to moderately severe pain. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).

distress. She had generalized muscle tenderness and experienced pain with all movement. There was no warmth or crepitus of the joints. Dr. Griffin diagnosed plaintiff with benign essential hypertension, chronic pain due to trauma, and nonorganic sleep disorder. Plaintiff was prescribed Norvasc, Hydrochlorothiazide, Tramadol, and Hydroxyzine.

Plaintiff returned to Dr. Griffin on September 29, 2008. (Tr. 407-08). She complained of knee pain and headaches. She reported that when Tramadol did not provide relief she took her husband's Clonidine. On examination, plaintiff had generalized muscle tenderness and pain on movement. She was prescribed Norvasc, Clonidine, and Feldene.

Plaintiff was seen at the DePaul Hospital emergency room on October 3, 2008, for treatment of vomiting, dizziness, and a panic attack. She had abdominal pain and multiple areas of body aches. She reported that she had been in a motor vehicle accident about one year earlier; later, she fell and hurt her back. (Tr. 281-92). She reported experiencing depression, fatigue and malaise. On examination, she had normal range of motion and low back pain on palpation. No edema was noted and her gait was normal. She received Compazine intravenously. Her sister, who accompanied her, reported that plaintiff was becoming more depressed and asked for a psychiatric referral. Plaintiff rated her pain at level 9 on a 10-point scale. She was given prescriptions for Percocet, Ultram, and Flexeril on discharge.

Plaintiff had an initial appointment with rheumatologist Zarmeena Ali, M.D., at the John C. Murphy Health Center, on October 21, 2008. (Tr. 356-59). Plaintiff's chief complaint was pain in her lower back, the back of her head, and her left knee. She reported that she experienced car accidents in December 2006 and July 2007 but did

-9-

not believe that her symptoms were related to these events. Her knee became more painful after she fell on stairs. She described a "buckling" sensation with intermittent swelling in the joint. She stated that she could not climb stairs. She complained of frequent heartburn, and nausea and vomiting with headaches, and chest pain that caused her to bend over. She stated she had tingling in her left leg. On examination, plaintiff's gait and stance were normal, as were her deep tendon reflexes. She had normal ranges of motion and full strength in her arms and legs; she had muscles spasms in the lumbosacral spine. Dr. Ali assessed plaintiff with a compression arthralgia of the knee and arthralgias in multiple sites. She was given prescriptions for Flexeril, Diclofenac, and Ultram, and was given an exercise regimen.

On November 24, 2008, plaintiff saw Dr. Griffin with complaints of a sore throat. (Tr. 404-05). His treatment notes indicate that plaintiff was receiving steroid injections for treatment of chronic pain. There are no findings regarding edema or plaintiff's spine, muscles or joints.

Plaintiff was seen at the DePaul Hospital emergency room on December 5, 2008, for evaluation of edema which she stated had been present for about one month. (Tr. 271-80). She also complained of pain in her neck and back and shortness of breath that had been present for about one week. On examination, plaintiff had paraspinal tenderness and pitting edema. Her breath sounds were normal and she was not in respiratory distress. Blood tests were negative for chronic heart failure, renal failure, and liver failure.

Plaintiff returned to the DePaul Hospital Emergency Room on December 31, 2008, with swelling in both legs and chest pains. (Tr. 313-19). She complained of pain in her back, arms, and legs. She stated that she had seen a pain management

-10-

specialist but stopped because she was not obtaining relief. She reported that she had had a cough for several weeks, accompanied by shortness of breath and post-nasal drip. She was admitted to the hospital for further evaluation. (Tr. 302-12). Pulmonary function tests were stable; there was no evidence of pulmonary embolism or deep vein thrombosis. A gastroenterology evaluation determined that she had gastritis and a hiatal hernia, and a cardiac evaluation indicated cardiomegaly and tortuosity of the aorta. Plaintiff's mild edema was due to her blood-pressure medication, Norvasc, and she was switched to Zestril. Plaintiff was discharged on January 2, 2009, following improvement in her breathing and leg swelling. (Tr. 302). On discharge, her medications for blood pressure were Clonodine, Maxzide, and Zestril; for pain and musculoskeletal conditions, Diclofenac, Flexeril, Tramadol, and Vicodin; in addition, she had Prilosec, Zocor, Hydroxyzine, and Zithromax.

On January 13, 2009, plaintiff returned to see Dr. Ali for a scheduled follow-up. (Tr. 348-53). Plaintiff reported that DePaul Hospital had diagnosed her with congestive heart failure. Id. On examination, Dr. Ali noted that plaintiff's gait was stooped and her reflexes were absent or diminished. Straight leg raising was negative, but her right shoulder abduction and left knee range of motion were limited. Dr. Ali's assessment included osteoarthritis and accelerated essential hypertension. Dr. Ali recommended consultation with an orthopedic surgeon for a meniscal injury in the left knee. She was advised to stop taking Diclofenac for pain, and to continue with Flexeril and Ultram and to begin Gabapentin.

On January 25, 2009, plaintiff returned to the DePaul Hospital Emergency Room with complaints of pain in her knees, legs, back and arms. She reported that she had

-11-

seen a pain management specialist. (Tr. 260-69). She stated that she had pain on a daily basis. She received morphine sulfate intravenously.

Plaintiff was seen by Dr. Griffin on January 30, 2009. (Tr. 398-99). She complained of swollen feet and pain in her lower back and right side and asked for "something for pain." She rated her pain at 8 on a 10-point scale. On examination, plaintiff had full range of motion of all joints, though she complained of pain with movement of her knees. She did not complain of muscle pain and no swelling was noted. She was prescribed Darvocet on discharge.

Plaintiff was seen in the Orthopedics Department at ConnectCare on February 23, 2009, for treatment of chronic back pain, pain in her left knee, and swelling in her feet. It was noted that she had symptoms of patellofemoral syndrome. Nonsteroidal anti-inflammatory medicines and exercises were prescribed. (Tr. 343). She received an injection in her left knee. See Tr. 561.

On February 25, 2009, plaintiff was seen by Asha Kodwani, M.D., at the John C. Murphy Health Center for follow-up on her hypertension. (Tr. 395-97). She reported that she missed taking her prescribed medications 3 or 4 times a week. She also stated that she was experiencing severe joint pain. On examination, she had full range of motion on all joints, with no swelling, redness or tenderness. A blood test indicated plaintiff's rheumatoid factor was within the normal range. (Tr. 582). Plaintiff was given a prescription for Darvocet, in addition to her blood pressure medications.

Plaintiff saw Dr. Ali on March 10, 2009. She complained of a headache and knee pain, which she rated at level 8. Her blood pressure was elevated. She reported that she had run out of her medication one month earlier. (Tr. 511). She was sent directly

-12-

to the urgent care center for treatment of her headache and was given an injection of Ketorolac tromethamine.[13]  (Tr. 437, 516).

Patricia Chaplin, a Disability Examiner, completed a Physical Residual Functional Capacity form on March 27, 2009.  (Tr. 448-54).  Based on a review of the medical records, Ms. Chaplin determined that plaintiff can occasionally lift or carry 20 pounds and frequently carry 10 pounds. She can sit, stand, or walk about 6 hours in an 8 hour day, and had no limitations in pushing or pulling.  Plaintiff can frequently balance; occasionally climb stairs, ramps, ladders, scaffolds, and ropes; and occasionally stoop, kneel, crouch, and crawl.  In support of the assessment, Ms. Chaplin noted that plaintiff alleged disability due to congestive heart failure, edema, degenerative arthritis, high blood pressure, fibromyalgia, chronic back pain, and weakness on her right side. Plaintiff missed taking her medication 3 or 4 times per week, which could be the cause of her edema.  She routinely had normal ranges of motion on examination.  X-rays in June 2008 showed minimal degenerative joint disease.  Ms. Chaplin found no medically determinable impairment for congestive heart failure or fibromyalgia.   Plaintiff's allegations were more severe than the objective medical evidence supported and were partially credible.

On March 30, 2009, Robert Cottone, Ph.D., completed a Psychiatric Review Technique form.  (Tr. 455-66).  Dr. Cottone found that plaintiff had no medically determinable impairment.  He noted that plaintiff had no recent treatment for depression and was routinely described as alert and appropriately oriented.  Plaintiff reported that she was depressed as a result of her physical impairments.  She had

_____

[13]Ketorolac tromethamine, or Toradol, is "a nonsteroidal antiinflammatory drug administered intramuscularly, intravenously, or orally for short-term management of pain[.]"  See Dorland's Illustrated Med. Dict. 1966, 998 (31st ed. 2007).

-13-

been prescribed Prozac at one time but stopped because it gave her demonic dreams. (Tr. 465, 164). She also stated that she developed "memory problems" after hitting her head in 2005.

Plaintiff was seen by Jamal Makhoul, M.D., at the John C. Murphy Health Center for treatment of her blood pressure and with complaints of pain and swelling on March 23, 2009; her strength, tone, gait, station and range of motion were all normal. She received prescriptions for Simvastin, Metoprolol, Cozaar, Hydrochlorothiazide, K-Dur,[14] and Darvocet. (Tr. 557-58). On April 13, 2009, Dr. Kodwani saw plaintiff for follow-up care of her blood pressure. (Tr. 553-55). Again, plaintiff had full range of motion in all joints without tenderness. A prescription of Piroxicam[15] was added. Id. Plaintiff saw Dr. Makhoul on April 20, 2009. On examination, plaintiff had normal gait and station, and normal muscle strength and tone, with no atrophy. (Tr. 549-51).

Plaintiff returned to the urgent care center on May 8, 2009, with complaints of sharp pain in the back of her knees and high blood pressure. (Tr. 502-04). She was treated with Toradol and Clonidine and was given a prescription for Vicodin.

On May 11, 2009, plaintiff was seen by Dr. Kodwani. (Tr. 542-43). She reported that she had gone to the urgent care center because she had a bad reaction to Piroxicam. She had full range of motion in all joints but complained of stiffness and tenderness in her lower back.

---

[14]K-Dur is a brand name for potassium. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601099.html#other-name. (last visited Sept. 1, 2011).

[15]Piroxicam is a nonsteroidal anti-inflammatory used to relive the symptoms of osteoarthritis and rheumatoid arthritis. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684045.html (last visited on July 29, 2011).

On May 14, 2009, plaintiff was evaluated for pain management services by William Feldner, D.O.  (Tr. 540-41).  Dr. Feldner reviewed x-rays of plaintiff's neck, lumbar spine, and knees and noted that they showed degenerative changes.  He counseled plaintiff on osteoarthritis and the need to maintain strength and flexibility. She was prescribed exercises and instructed on the proper use of ice and resting.  The importance of compliance was stressed.  Dr. Feldner noted that he could not say if plaintiff truly had fibromyalgia.  He ordered a trial of Gabapentin but noted that he would avoid narcotics.

Dr. Ali completed a Physical Residual Functional Capacity Questionnaire on May 15, 2009.  (Tr. 467-71).  Dr. Ali noted that she had seen plaintiff a total of 3 times. Plaintiff's diagnoses were listed as osteoarthritis and uncontrolled blood pressure; the prognosis was "fair."  Plaintiff's symptoms included lower back and leg pain, tingling in the left leg, insomnia due to pain, depression, and an inability to climb stairs due to left knee pain.  Plaintiff had gained 20 pounds since 2006.  Under clinical findings and objective signs, Dr. Ali noted bilateral spasm in the lumbar spine; stooped gait; decreased reflexes overall; decreased range of motion in the right shoulder; and effusion and tenderness in the left knee.  Depression contributed to plaintiff's condition. Dr. Ali opined that plaintiff's pain or other symptoms would occasionally interfere with plaintiff's ability to pay attention and concentrate and that she could tolerate only low stress jobs.  Plaintiff could sit or stand for 30 minutes before needing to change positions; she could sit or stand/walk for less than 2 hours in an 8 hour day.  Plaintiff would need to walk around every 20 to 30 minutes for 5 to 10 minutes.  She would need 4 or 5 breaks of 5 or 10 minutes' duration every work day.  Because of her edema, her legs should be elevated about 12 inches from the floor.  Dr. Ali imposed

-15-

a 10-pound limit on lifting.  Plaintiff could only occasionally turn her head, look up or down, or hold her head in a static position.  She could never crouch or squat and rarely twist, stoop, or climb ladders or stairs.  Dr. Ali opined that plaintiff was likely to miss more than 4 days of work a month because her symptoms were not well controlled due to inadequate follow-up and poorly controlled hypertension.

On June 5, 2009, plaintiff told Dr. Ali that she had been experiencing pain in her right arm and hip for eight months.  (Tr. 498-500).  She also stated that she had rheumatoid arthritis.   Dr. Ali assessed plaintiff as having osteoarthritis and fibromyalgia.  She was prescribed Baclofen,[16] Tylenol with codeine, and Gabapentin. On July 1, 2009, plaintiff requested a refill of Darvocet.  (Tr. 537).

Plaintiff was assessed in the Cardiology Department of St. Louis ConnectCare on July 20, 2009.  (Tr. 492-93).  She stated that the swelling in her legs began in December 2008.  She also reported shortness of breath and a "many year" history of chest pain, which was noted to be substernal, press-like, and radiating to her left shoulder.  The examining physician noted a "small innocent systolic ejection murmur" and noted no signs of congestive heart failure.  The plan called for adjusting plaintiff's medications to assure control of her blood pressure before referring her for a stress test.  Her prescriptions for Baclofen and Sulindac were discontinued and she was started on Norvasc.

Plaintiff returned to the urgent care center on August 6, 2009, for treatment of pain and swelling in her legs and ankles, and pain in her right leg.  (Tr. 485-87).  She stated that she was out of Flexeril and Vicodin.  Plaintiff was noted to be in acute

_____

[16]Baclofen decreases the number and severity of muscle spasms. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682530.html (last visited on Sept. 1, 2011).

-16-

distress with pain in her right leg, moaning loudly from time to time. On examination, tenderness was elicited throughout the right leg, particularly around the knee, which was normal to inspection and had full range of motion. The right ankle was not swollen and had a full range of motion. She was treated with an injection of Ketorolac tromethamine. A chest x-ray taken on August 11, 2009, disclosed that plaintiff's heart size was at the upper limits of normal; also disclosed was a mildly tortuous aorta. (Tr. 562).

Plaintiff saw Dr. Ali for follow-up on August 25, 2009. (Tr. 478-80). She reported mild pain. On examination, Dr. Ali noted pain in both shoulders with motion; positive straight-leg raising on the right, crepitus in both knees, and genu valgus[17] in the right knee. An MRI of the right knee completed on September 28, 2009 disclosed moderate generalized patellar chondrosis, moderate to severe chondrosis in the lateral tibial plateau, and a tear in the meniscus . (Tr. 604). On a return visit to Dr. Ali on November 3, 2009, plaintiff reported that she had received an interarticular injection for the right knee which provided mild relief. (Tr. 596-99). She also reported wide-spread pain. Her muscle strength was slightly reduced due to pain; her reflexes, gait and strength were normal. The records reflect an injection was administered to plaintiff's left knee on November 11, 2009. (Tr. 591).

Plaintiff was evaluated by a social worker at the John C. Murphy Health Center on October 21, 2009. (Tr. 613). She reported that she was depressed and thinking of hurting herself, although she denied having a specific plan. Her symptoms included crying spells, memory loss, lethargy, headaches, visual hallucinations, and thoughts

---

[17]"Genus valgus" means knock-kneed. See The Merck Manual of Diagnosis and Therapy 2248 (16th ed. 2000).

-17-

of dying.  She also reported that she was having panic attacks about once a week.  Id.

Her symptoms began three years earlier following an accident and the death of her

sister but had worsened in the last year.  She had recently separated from her

husband.  She was scheduled for in-home screening and wrap-around services.

## IV.  The ALJ's Decision

In the decision issued on March 8, 2010, the ALJ made the following findings:

1.    Plaintiff meets the insured status requirements of the Social Security Act
      through December 31, 2012.

2.    Plaintiff has not engaged in substantial gainful activity since April 10,
      2008, the alleged date of onset.

3.    Plaintiff has the following severe impairments: fibromyalgia, degenerative
      changes of the spine, degenerative changes of the left knee and obesity.

4.    Plaintiff does not have an impairment or combination of impairments that
      meets or substantially equals one of the listed impairments in 20 C.F.R.
      Part 404, Subpart P, Appendix 1.

5.    Plaintiff has the residual functional capacity to lift and/or carry 20 pounds
      occasionally and 10 pounds frequently; to sit, stand and/or walk with
      usual breaks for 6 hours in an 8 hour day.  She cannot climb ropes,
      ladders or scaffolds and can only occasionally climb stairs and ramps.
      She can occasionally stoop, kneel, and crouch.  She is unable to
      constantly operate foot controls on the left and should avoid concentrated
      exposure to extreme cold, vibrations and unprotected heights.

6.    Plaintiff is able to perform her past relevant work as a prep cook and
      counselor.

7.    Plaintiff has not been under a disability, as defined in the Social Security
      Act, from April 10, 2008, through the date of the decision.

(Tr. 13-26).

The ALJ also found that plaintiff's medically determinable impairments could

reasonably be expected to cause the alleged symptoms, but that her statements

regarding the intensity, persistence and limiting effects of the symptoms were not

credible to the extent that they were inconsistent with the residual functional capacity

-18-

(RFC) determination.  (Tr. 24).  In support of this credibility determination, the ALJ

cited the relative lack of more significant clinical findings during examinations.  He also

noted that plaintiff had the ability to prepare meals, sweep, complete laundry and iron,

shop in stores, and use public transportation.  In addition, he noted that plaintiff had

applied for unemployment benefits since her alleged date of disability.  In applying for

such benefits, she necessarily indicated that she was available, willing, and able to

work.  (Tr. 24-25).  Plaintiff does not challenge the ALJ's credibility determination.  She

also does not challenge his findings that her alleged cardiac condition, depression and

insomnia were not "severe" impairments.  (Tr. 20).

## V.  Discussion

To be eligible for disability insurance benefits, plaintiff must prove that she is

disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  The Social

Security Act defines disability as the "inability to engage in any substantial gainful

activity by reason of a medically determinable physical or mental impairment which can

be expected to result in death or which can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A) (2000).  An

individual will be declared disabled "only if his physical or mental impairment or

impairments are of such severity that he is not only unable to do his previous work but

cannot, considering his age, education, and work experience, engage in any other kind

of substantial gainful work which exists in the national economy."  42 U.S.C. §§

423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-

step evaluation process, "under which the ALJ must make specific findings." Nimick

v. Secretary of Health and Human Servs., 887 F.2d 864, 868 (8th Cir. 1989).  The ALJ

-19-

first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A.    Standard of Review

The district court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the court finds it possible to draw two inconsistent from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the decision of the

Commissioner.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

### B.    Plaintiff's Allegations of Error

Plaintiff contends that the ALJ (1) improperly considered opinion evidence, (2) committed errors with respect to the hypothetical posed to the vocational expert, and (3) inadvertently gave the opinion of the state disability examiner the same weight as a medical consultant.

#### 1.    The ALJ's Consideration of Opinion Evidence

Plaintiff complains that the ALJ failed to accord the proper weight to the opinion of Dr. Zarmeena Ali, her treating physician, regarding plaintiff's residual functional capacity.  Dr. Ali imposed limitations on plaintiff's capacity to a degree that would preclude all work.  The ALJ accorded Dr. Ali's opinion nominal weight, finding that her assessment was not supported by objective clinical findings in her examination reports.

A treating physician's opinion may be, but is not automatically, entitled to controlling weight.  20 C.F.R. § 404.1527(d)(2).  Controlling weight may not be given unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques.  SSR 96-2P, 1996 WL 374188 (July 2, 1996).  Even a well-supported medical opinion will not be given controlling weight if it is inconsistent with other substantial evidence in the record.  Id.  "The record must be evaluated as a whole to determine whether the treating physician's opinion should control."  Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009).  When a treating physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight."  Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010) (quoting Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir.2002)).  "A treating physician's opinion does

not automatically control, since the record must be evaluated as a whole." Perkins v. Astrue, --- F.3d ---, 2011 WL 3477199, *2 (8th Cir. 2011) (quoting Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009)). The ALJ is charged with the responsibility of resolving conflicts among the medical opinions. Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008).

Dr. Ali completed her assessment of plaintiff's RFC on May 15, 2009. She had seen plaintiff a total of three times since October 21, 2008. (Tr. 467). She stated that plaintiff needed to elevate her legs for much of the day; was unable to lift more than 10 pounds; had very limited capacity to look up or down or hold her head in a steady position; and was unable to sit, stand or walk as much as 2 hours in an 8-hour day.

The treatment notes do not reflect the degree of limitation Dr. Ali imposed in her RFC assessment. On plaintiff's first visit, on October 21, 2008, Dr. Ali noted: no decrease in the suppleness of plaintiff's neck; muscle spasms over the iliolumbar region and sciatic notch; normal balance, gait, stance, and deep tendon reflexes; and painful full extension of the left knee. Plaintiff had full strength and full ranges of motion of the extremities. (Tr. 358). There was no indication of effusion. On January 13, 2009, Dr. Ali noted: full range of motion of plaintiff's neck; pain on rotation of her right shoulder; muscle spasms of the lumbar spine; normal balance and a stooped gait; absent or diminished deep tendon reflexes; mild effusion of the left knee and pain on extension; and negative straight-leg raising test. (Tr. 349-50). On March 10, 2009, plaintiff presented with a severe headache and elevated blood pressure and she was referred to Urgent Care for immediate treatment of her blood pressure; no clinical

findings were recorded. (Tr. 511). These findings indicate some degree of impairment but do not provide support for the limitations Dr. Ali imposed.

In addition to lacking support within her own treatment notes, Dr. Ali's opinion is inconsistent with other evidence in the record. X-rays showed minimal degenerative changes of the spine and knees. (Tr. 361, 367). An MRI in September 2009 showed moderate to severe chondrosis and a meniscal tear in the right knee. There is no indication of the severity of the tear, but plaintiff reported that she received some relief from an interarticular injection. No physician ever imposed limitations on plaintiff's daily activities and she was routinely prescribed exercises to strengthen her knees. As the ALJ noted, the prescription of an exercise program tends to undermine plaintiff's claim that she is incapable of most activity. An orthopedic specialist and a pain management specialist both prescribed nonsteroidal anti-inflammatory medications, rather than strong pain medication, for treatment of her conditions. Plaintiff was routinely advised to lose weight, but she continued to gain weight. With respect to plaintiff's allegations that she is disabled due to congestive heart failure, fibromyalgia, and high blood pressure, blood tests were negative for rheumatoid arthritis and congestive heart failure, and Dr. Feldner was unwilling to commit to a diagnosis of fibromyalgia. Plaintiff's blood pressure was uncontrolled, but she was routinely noncompliant with medication. "Impairments that are controllable or amenable to treatment do not support a finding of disability, and '[f]ailure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits.'" Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (quoting Roth v. Shalala, 45 F.3d 279, 282 (8th Cir. 1995)).

-23-

The Court concludes that the ALJ did not err in affording nominal weight to Dr. Ali's assessment of plaintiff's residual functional capacity.

### 2.    Variation in the RFC

Plaintiff argues that the RFC formulation posed to the vocational expert varied from that in the ALJ's decision.

The hypothetical posed to the Dr. McGowan stated:  "It has been opined this hypothetical claimant can . . . [s]tand or walk for six hours out of eight [and] sit for six."  (Tr. 47).  The ALJ's decision formulated plaintiff's RFC as including the capacity to "sit, stand and/or walk (with usual breaks) for about 6 hours in an 8 hour workday."  (Tr. 23).

Plaintiff complains that the RFC contained in the ALJ's decision specifies a six-hour workday and therefore precludes full-time employment.  This is a fundamental misreading of the decision.  The ALJ determined that plaintiff could sit for 6 hours and walk or stand for 6 hours in an 8-hour workday.  This is the same RFC posed to the vocational expert.  Plaintiff's second allegation of error lacks merit.

### 3.    The Opinion of the Disability Examiner

The ALJ stated that he "considered the administrative findings of fact made by the State agency medical physicians and other consultants" and weighed them as "non-examining expert sources."  (Tr. 26, citing SSR 96-6p).  There were two State agency consultants in this case: Patricia Chaplin, a non-medical examiner, completed the Physical RFC Assessment; Robert Cottone, Ph.D., a psychologist, completed the Psychiatric Review Technique form.  Psychologists are "acceptable medical sources." 20 C.F.R. § 404.1513(a)(2).

Plaintiff alleges that the ALJ's statement indicates that he improperly gave the opinion of Ms. Chaplin – a lay person – the weight reserved for the opinion of a medical expert.  See Dewey v. Astrue, 509 F.3d 447, 449 (8th Cir. 2007) (ALJ erred in weighing the opinion of lay person under rules appropriate for weighing medical consultant's opinion).  There is no evidence that the ALJ relied on Ms. Chaplin's opinion in formulating his RFC.  First, he did not state that he was relying on her opinion.  Second, the RFC the ALJ formulated was more restrictive than that of the examiner.  Plaintiff's third allegation of error is rejected.

## VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.  Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in her brief in support of complaint [#12] is **denied**.

A separate judgment in accordance with this order will be entered this same date.



CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 17th day of January, 2012.

-25-